# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

MARTIN STRAZNICKY, M.D.,

    Plaintiff,

v.

DESERT SPRINGS HOSPITAL, *et al.*,

    Defendants.

Case No. 2:09-cv-00731-LDG (RJJ)

**ORDER**

This matter is before the court on the defendants' motions to dismiss (## 18, 27) the complaint filed by Martin Straznicky, M.D. pursuant to Fed. R. Civ. Pro. 12(b)(6) for failure to state a claim. Straznicky opposes both motions (## 29, 37). The court will grant the motions.

<u>Motions to Dismiss</u>

The defendants' motions to dismiss, brought pursuant to Rule 12(b)(6), challenge whether the plaintiff's complaint states "a claim upon which relief can be granted." In ruling upon these motions, the court is governed by the relaxed requirement of Rule 8(a)(2) that the complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." As summarized by the Supreme Court, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.*

*v. Twombly*, 127 S.Ct. 1955, 1974 (U.S. 2007).  Nevertheless, while a complaint "does not need detailed factual allegations, a plaintiff's obligations to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.,* (citations omitted).  In deciding whether the factual allegations state a claim, the court accepts those allegations as true, as "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).  Further, the court "construe[s] the pleadings in the light most favorable to the nonmoving party." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F3.d 895, 900 (9th Cir. 2007).

Procedural Background

Straznicky initiated this action by filing his complaint on April 23, 2009.  The following day, he filed a motion for a temporary restraining order and for a preliminary injunction.  In so doing, Straznicky attached several exhibits to his motion, including copies of documents referenced in his complaint.  The court heard arguments on the TRO motion, denied the motion, and set a hearing on the motion for a preliminary injunction.  At the outset of the preliminary injunction hearing, Straznicky requested that the hearing be continued for several weeks.

Straznicky moved to consolidate this matter with two other cases involving doctors and hospitals that are being prosecuted by his counsel.

At a status conference prior to the continued preliminary injunction hearing, the court denied the motion to consolidate, and vacated the preliminary injunction hearing.

Pending before the court are the defendants' motions to dismiss, which Straznicky opposes.  This court heard arguments from the parties.

Factual Background

As this matter is before the court on motions to dismiss for failure to state a claim, this factual background relies solely upon the allegations of the complaint, and upon those

documents referenced in the complaint which Straznicky submitted to the court with his motion for a temporary restraining order.

On February 2, 2009, a neurosurgeon was performing a spinal procedure on a patient under Straznicky's care. X-rays would be taken during this procedure, but Straznicky did not have a lead shield in the operating room. Straznicky instructed a radiology technologist to go into an adjacent operating room to obtain the lead shield.

In the adjacent operating room, Dr. Hugh Bassewitz (named by Straznicky as a defendant) was performing a surgery that was already in process. Dr. Bassewitz informed the technologist that he could not take the shield. When the technologist informed Straznicky of this, Straznicky then entered the adjacent operating room in which Dr. Bassewitz was performing surgery, and asked Dr. Bassewitz about using the lead shield. Dr. Bassewitz denied Straznicky's request. Nevertheless, Straznicky took the lead shield.

On February 6, 2009, Straznicky received a letter from Drs. Michael L. Gross and Zafir Y. Diamant. The contents of that letter, which are before the court,[1] notified Straznicky that the Medical Executive Committee (MEC) had summarily suspended him as of February 6, 2009. The decision to summarily suspend Straznicky was based upon a report received by the Medical Staff leadership indicating that Straznicky had "exhibited conduct that 'requires that immediate action be taken to reduce a substantial likelihood of imminent impairment of the health or safety of any patient, prospective patient, employee or other person present in the hospital. . . .'"

The letter then recites a portion of the report received by the Medical Staff leadership:

> A Radiology tech came into Room 8 while surgery was in process and requested to borrow the x-ray shield for Dr. Straznicky. He was advised that he could not use the shield as the equipment was needed for the ongoing

---

[1] Straznicky references the letter in his complaint, and submitted the letter as an attachment to his TRO motion.

3

> case. He left and approximately two minutes later, Dr. Straznicky came into the room and questioned the surgical team and Dr. Bassewitz about the x-ray shield. He began to get confrontational about the shield and when he became visibly upset, Dr. Bassewitz kindly but sternly asked Dr. Straznicky to leave his room. Dr. Straznicky said, "Fine" and left the room but took the x-ray shield with him. Dr. Bassewitz was visibly disturbed by the confrontation and requested to speak with administrative personnel, which was done.

The letter describes this as "disruptive conduct that caused a distraction for the surgeon, and, thereby caused a probability of danger to the patient."

The letter further notified Straznicky that he could request an "interview" with the Medical Executive Committee "for the purpose of determining whether or not the summary suspension should be terminated pending an evidentiary hearing," and that "[s]uch evidentiary hearing must be simultaneously requested. . . ."

On February 13, Straznicky requested an interview with the Medical Executive Committee, but did not simultaneously request an evidentiary hearing. On February 16, Straznicky amended his request for an interview and requested an evidentiary hearing.

On February 18, the Medical Executive Committee interviewed Straznicky.

On February 19, Straznicky received a letter from Dr. Gross. In the letter,[2] Dr. Gross informed Straznicky:

> Based upon your appearance and a review of the issues surrounding your summary suspension, the MEC has recommended your summary suspension be terminated provided you comply with the following:
>
> • You must report as soon as possible and no later thirty (30) [sic] days from the date of this letter to the Nevada Physicians Health Program (NPHP) for evaluation; and you must follow the NPHP's recommendation, if any, for behavioral modification. Failure to timely report to the NPHP and follow its recommendations, including maintain advocacy by the NPHP, will subject you to further disciplinary action. The NPHP's Director is Dr. Peter Mansky. . . .
> • Apologize to the health care team involved in the incident that initiated the summary suspension. In addition, you agree to refrain from verbal, written or insinuated retaliation or retribution toward any of the

---

[2] Straznicky summarizes portions of the letter in his complaint, and submitted the letter to the court as an attachment to his TRO motion.

> individuals involved in the incident leading to your summary suspension, or any of the hospital's nursing or health care staff.
>
> • You enter into a Privilege Retention Agreement acknowledging, among other things, Desert Springs' zero tolerance policy for disruptive behavior, which continues for the duration of your Medical Staff membership at Desert Springs.

A copy of the Privilege Retention Agreement is enclosed for your review and execution. Please return the executed Agreement to the Medical Staff Department within ten days of receipt of letter [sic] and no later than March 3, 2009. Failure to comply with the recommendations of the MEC may result in disciplinary action, including the continuation of suspension.

Straznicky sought, but did not receive, an alternative resolution. He was informed that if he did not sign the Privilege Retention Agreement, his continued suspension would trigger a requirement to report the suspension to the National Practitioner Data Bank (Data Bank).

Straznicky and Dr. Gross signed the Privilege Retention Agreement on March 3, 2009. Dr. Gross informed Straznicky that his privileges were reinstated.

On March 3, Straznicky also asked Desert Springs' CEO, Sam Kaufman, and another individual whether he was under investigation, to which they replied there were "no investigations of any kind regarding or involving him."

On March 26, Straznicky asked the Director of Medical Staff about the status of his privileges. She replied that they were in good standing and without restriction. Straznicky then resigned.

On April 10, 2009, Desert Springs filed an adverse action report regarding Plaintiff in the Data Bank. The report states that the Adverse Action Classification Code as "Voluntary Surrender of Clinical Privilege(s), while under, or to avoid, investigation relating to

professional competence or conduct (1635)."[3] The report goes on to describe the underlying events:

> Practitioner was summarily suspended on February 6, 2009, as a result of quality of care issues related to practitioner's disruptive and unprofessional conduct. Summary suspension was deemed necessary to reduce the substantial likelihood of imminent impairment to the health or safety of the hospital's patients. The summary suspension was issued by the Chief of Staff and the Chairman of the Department of Anesthesiology, and on behalf of the Medical Executive Committee, in accordance with the Credentialing Manual of the Medical Staff, Section 9.7.1. The practitioner requested and was granted an interview with the Medical Executive Committee. The interview was held on February 18, 2009. Following the interview, the Medical Executive Committee elected to lift the suspension and cease its investigation related to practitioner, provided that the practitioner enter into and comply with a Privilege Retention Agreement. On March 3, 2009, the practitioner entered into a Privilege Retention Agreeement with the Medical Executive Committee, pursuant to which the practitioner's full clinical privileges were restored, and the practitioner agreed to engage in certain corrective actions. On March 26, 2009, prior to completing the corrective actions required under the Privilege Retention Agreement, the practitioner notified the hospital that he was resigning from the medical staff. As the practitioner entered into the Privilege Retention Agreement to avoid investigation and then resigned prior to completing the terms of the Privilege Retention Agreement, his resignation was a surrender of his clinical privileges to avoid investigation.

Based upon this alleged conduct, Straznicky alleges a claim for declaratory and injunctive relief, three anti-trust claims, a 42 U.S.C. §1983 claim, and eight state law claims.

Dr. Bassewitz' Motion to Dismiss

With little difficulty, the court concludes that the complaint must be dismissed as to Dr. Bassewitz. In his complaint, Straznicky makes only two allegations that specifically concern Dr. Bassewitz's conduct. First, that Dr. Bassewitz informed the technologist (sent by Straznicky) that he could not take the lead shield. Second, when Straznicky personally inquired about the lead shield, Dr. Bassewitz "was belligerent and refused to assist"

---

[3] Again, the contents of the Data Bank report are properly before the court as Straznicky referenced the Data Bank report in his complaint, and he attached a copy of the report to his TRO motion.

Straznicky. While Straznicky's complaint also contains numerous allegations directed generally at conduct by "Defendants," the context makes clear that much of the alleged conduct cannot be attributed to Dr. Bassewitz. For example, Straznicky alleges that the "Defendants" reported an action taken against him to the Data Bank. Dr. Bassewitz, however, is not an entity who can file such a report. Further, the report itself establishes that it was filed by Desert Springs Hospital. Similarly, Straznicky seeks to hold all defendants, including Dr. Bassewitz, liable for a breach of an implied covenant of good faith and fair dealing. Straznicky, however, does not allege that he entered into any agreement with Dr. Bassewitz or with any defendant other than Desert Springs Hospital. Further, in opposing the motion to dismiss, both in the papers he submitted to the court and in his arguments during the hearing, Straznicky failed to offer any argument or theory suggesting how the allegations of the complaint are sufficient to state a claim for breach of the implied covenant as to Dr. Bassewitz.

Indeed, Straznicky's opposition is the most telling signal of the complaint's failure to state a claim against Dr. Bassewitz. Straznicky introduces his opposition by expressly "tak[ing] liberty to expound on his allegations against Defendant Bassewitz." *Opposition to Bassewitz Motion*, at 3. Straznicky then goes on to assert that Dr. Bassewitz "participated in peer review activities and controlled, coerced or unduly influenced the decisionmaking [sic] process." *Id.* Straznicky then recites a lengthy "Statement of Facts" that, while repeating some of the allegations of the complaint, fails to cite to the complaint in support of those allegations. Further, the opposition asserts numerous allegations not contained within the complaint, and thus improper for consideration in deciding the motion to dismiss. Moreover, although the opposition is in response to Dr. Bassewitz' motion to dismiss, none of these new and additional allegations concern the conduct of Dr. Bassewitz.

Straznicky also concludes, in his opposition, that Dr. Bassewitz "is properly included in the present case because of his role in the professional review activity as defined by

HCQIA. *Id.*, at 9.  Once again, although this matter is before the court to test the sufficiency of the allegations of his complaint, Straznicky fails to cite to any allegation of his complaint to support this conclusion.  As Straznicky has not even offered an argument explaining how the allegations of his complaint state a claim against Dr. Bassewitz, the complaint must be dismissed as to Dr. Bassewitz.

### The Other Defendants' Motion to Dismiss

The remaining defendants--Desert Springs Hospital and Medical Center, the Board of Trustees of Desert Springs Hospital, the Medical and Dental Staff of Desert Springs Hospital, Michael Gross, M.D., Zafir Diamont, M.D., and Sam Kaufman–also move to dismiss the complaint.  Dr. Bassewitz has filed a joinder in the motion.  Accordingly, for clarity, the court will treat the motion as if filed by all defendants.

The first argument raised in the motion is that this court lacks jurisdiction because Straznicky agreed, by signing the Privilege Retention Agreement, that exclusive jurisdiction vested in the Eighth Judicial District Court of the State of Nevada to enforce the Agreement.  On initial consideration, the argument is somewhat confusing as the face of the complaint does not indicate that Straznicky brought this suit to enforce the terms of the Privilege Retention Agreement.  Indeed, citing to his complaint generally, Straznicky argues that he "has not raised a claim for breach of contract."

The court notes, however, that the defendants refer to Straznicky's motion for a TRO in raising their argument.  In support of that motion, Straznicky expressly argued that he was entitled to an injunction because he was likely to succeed on the merits of his claim for breach of contract.  Further, his arguments in that motion make clear that the contract at issue was the Privilege Retention Agreement he signed on March 3, 2009.  As Straznicky now concedes, however, his complaint lacks a claim for breach of contract.  Accordingly, as Straznicky concedes that he has not alleged a claim for breach of contract of the

8

Privilege Retention Agreement, this court has jurisdiction. Nevertheless, the court will duly consider Straznicky's concession--that he has not alleged a claim for breach of contract--when the court decides the motion for a preliminary injunction and must determine whether he is likely to succeed on the merits of the "breach of contract" claim.

The second issue raised by defendants' motion is whether Straznicky's claims, to the extent that they depend upon a determination that Desert Springs was not legally required to file an adverse action report in the Data Bank, are premature because he has not obtained a determination from the Secretary of Health and Human Services that Desert Springs was not legally required to file an adverse action report. Pursuant to the Health Care Quality Improvement Act, 42 U.S.C. §11101 *et seq*., health care entities are legally required to report "accept[ing] the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or (ii) in return for not conducting such an investigation or proceeding. . . ." 42 U.S.C. §11133(a)(1)(B). The sanction against a health care entity that fails to substantially comply with this requirement is significant: the health care entity loses the statutory immunity created in §11111(a)(1) of the HCQIA. 42 U.S.C. §11133(c)(1). The Act provides, however, that the Secretary establish procedures by which a health care practitioner may dispute the accuracy of a submitted adverse action. 42 U.S.C. §11136(2). The Secretary has promulgated this procedure by regulation at 45 C.F.R. 60.14. As an adverse report includes a statement as to the basis for the action triggering the duty to report, an adverse report is inaccurate if a basis does not exist requiring a health care entity to file the report.

The National Practitioner Data Bank Guidebook (Data Bank Guidebook), published by the Secretary, confirms that the Secretary's authority to review a report for accuracy extends to and includes whether the health care entity was legally required to file the report. As summarized in the Guidebook, "[t]he dispute process is not an avenue to . . .

appeal the underlying reasons of an adverse action affecting the subject's license, clinical privileges, or professional society membership. Neither the merits of . . . the appropriateness of, or basis for, an adverse action may be disputed." Data Bank Guidebook at F-1. Rather, "[t]he Secretary reviews disputed reports only for accuracy of factual information and <u>to ensure that the information was required to be reported</u>." *Id.*, at F-3 (emphasis added). "If the Secretary concludes that the report was submitted in error, the Secretary directs that the report be voided from the NPDB." *Id.*, at F-5. Notice is then sent to all entities who have received notice of the disputed report to inform them that the report was voided. *Id.*

Though Straznicky's complaint is not an example of clarity, his subsequent arguments to the court make clear that he intended some of his claims to be based, at least in part, on his dispute whether Desert Springs was legally required to report that he voluntarily surrendered his clinical privileges while under or to avoid an investigation relating to professional competence or conduct. The Secretary has authority to review whether a report was required to be filed, and has authority to remedy an incorrect filing by voiding a report.

Straznicky's argument that some types of disputes are outside of the Secretary's scope of review is unavailing. Although the Secretary cannot review some types of disputes, the Secretary can review whether an adverse report was required to be reported, and has authority to order that a report be voided if it was not required to be filed. Equally unavailing is Straznicky's argument that procedures exist by which a report can be modified subsequent to a judicial review of the underlying adverse action. The examples provided in the Guidebook reveal that such provisions concern disputes that are outside the scope of the Secretary's review. Straznicky's reliance on the Data Bank Fact Sheet, and his argument that it provides for procedures for attorneys to obtain reports for use in litigation, is also misplaced. Read in context, those procedures make clear that they apply to

10

counsel representing a plaintiff in a malpractice claim against a hospital, and then only after the attorney establishes that the hospital has not disclosed the report despite a discovery request. That a plaintiff may bring a malpractice action against a hospital in federal court does not require a determination that the Secretary is not the appropriate authority to decide whether an adverse report was required to be filed.

By contrast, the First Circuit's deference to the Secretary in *Doe v. Leavitt*, 552 F.3d __, (First Cir. 2009) supports the conclusion that the Secretary has authority to resolve the underlying question presented by Straznicky: whether he resigned while under or to avoid investigation. Thus, prior to bringing his claims (at least as far as they rely on his allegation that the adverse report was not required to be filed), Straznicky must exhaust his administrative remedy by filing a dispute with the Secretary and obtaining a resolution of that dispute. Straznicky has not alleged, in his complaint,[4] that he has filed a dispute with the Secretary regarding the accuracy of the adverse report. Further, Straznicky has not alleged, in his complaint, that the Secretary resolved such a dispute. Accordingly, to the extent that Straznicky's claims require a determination by the Secretary that Straznicky's resignation did not trigger a legal duty requiring Desert Springs to file the adverse action report, the claims are premature and must be dismissed.

The defendants argue that the complaint must be dismissed, with prejudice, to the extent that, as the underlying professional review action met the standards of §11112(a), they cannot be held liable for damages pursuant to §11111 of the HCQIA.[5] Pursuant to §11112(a), immunity from damages under the HCQIA relies upon a statutory presumption

---

[4] Straznicky has represented to the court that he has filed a dispute, but that the dispute has not yet been resolved by the Secretary.

[5] The defendants make clear, in their papers, that they seek immunity and dismissal only as to Straznicky's claims for damages <u>other than</u> his §1983 claim. As conceded by the defendants, §11111 immunity does not extend to either equitable relief or to a civil rights action.

that the underlying professional review action met the standards set out in §11112(a). The burden rests upon the plaintiff to overcome that presumption by a preponderance of the evidence. *Id*. Thus, in reviewing the issue, the court begins with the presumption that the professional review action complied with §11112(a). However, as the question is before the court on defendants' motion to dismiss, Straznicky may rebut the presumption by showing that he alleged sufficient facts in his complaint. Accordingly, the court will consider the defendants' argument in light of the allegations of the complaint and the documents referenced by Straznicky in his complaint that he has presented to the court.

Straznicky's opposition does little to assist the court in finding that he has alleged sufficient facts to overcome the presumption that the professional review action did not comply with §11112(a). Rather, he relies upon a citation to the entirety of his general allegations, and the allegations of Claims 1 and 5 through 9, and summarily asserts he pled sufficient facts. Critically, though Straznicky argues he alleged that the defendants did not provide him with due process, he does not address any of the four §11112(a) requirements pursuant to which this court must review the propriety of a professional review action. The court, however, will address each of the factors.

The record establishes that the Medical Executive Committee's (MEC) summary suspension of Straznicky meets the first requirement that the MEC reasonably believed that the professional review action was taken to further quality health care. The Notice of Summary Suspension states that the suspension was "taken to reduce a substantial likelihood of imminent impairment of the health or safety of any patient, prospective patient, employee or other person present in the hospital. . . .'" Section 11112(c)(2) implicitly recognizes that a professional review body can reasonably believe that this type of action furthers quality health care. By its own terms, §11112(c) expressly establishes that, for purposes of §11111(a), nothing in the section is to be construed to preclude an immediate suspension of privileges "where the failure to take such an action may result in an imminent

danger to the health of any individual." As Congress has recognized that an immediate suspension is appropriate in certain circumstances related to the quality of health care (when the action may reduce imminent danger to someone's health), a reviewing body can form a reasonable belief that such an action furthers quality health care. In finding that the first requirement is met, the court is not concluding that the MEC's summary suspension of Straznicky was warranted in this case. Rather, the court is concluding only that a reviewing body can reasonably believe that summarily suspending a practitioner's privileges to reduce the likelihood of imminent impairment of the health of a person is an action in the furtherance of quality health care.

The second requirement addresses whether a reasonable effort was made to obtain the facts. The fourth requirement addresses whether the MEC could reasonably believe that the facts warranted the imposition of a summary suspension. As the MEC imposed the summary suspension based upon its receipt of a single report, whether the effort to obtain facts was reasonable coincides with the determination whether the MEC reasonably believed those facts warranted summary suspension.

While Straznicky generally argues a lack of due process, his opposition does not cite to any allegation of his complaint suggesting that the MEC did not engage in a reasonable effort to obtain the facts before deciding to summarily suspend him. In this case, the effort to obtain facts before the summary suspension consisted solely of receiving a report of Straznicky's conduct. Thus, this effort was reasonable *if* the reported facts not only warranted a summary suspension, but if those reported facts warranted such action without any further effort to obtain facts.

Though not argued by Straznicky, the circumstances indicate that the MEC could reasonably rely upon the single report. While the allegations of Straznicky's complaint and the report (at least, that portion cited in the Notice of Summary Suspension) differ in some minor details, the two accounts are remarkably consistent. The consistency indicates the

MEC could reasonably rely upon the source of the report as reliable regarding the materially significant events, and that reliance was reasonably placed on the report as a substantially accurate description of those events.

The nature of the conduct reported to the MEC indicated that Straznicky's conduct placed individuals in imminent harm. The court readily concludes that a patient is placed in danger of imminent harm when someone causes the surgeon, who is performing a procedure on a patient, to become visibly disturbed and distracted during the procedure. The removal of protective equipment also constitutes conduct placing someone in imminent harm.[6]

Straznicky argues, elsewhere in his opposition, that his conduct on February 2 "did not create an on-going imminent harm to patients." The argument ignores that past disruptive conduct can be indicative of an underlying characteristic that could manifest in future disruptive conduct. When the nature of the disruptive conduct indicates both that an imminent harm to a patient occurred and that the failure to take immediate action may result in imminent danger to the health of individuals, a reviewing body can reasonably believe that an immediate, summary suspension is warranted. The nature of Straznicky's conduct was such that the MEC could reasonably believe that a summary suspension was warranted.

The court would further note that it would reach the same conclusion if Straznicky had reported his conduct, as he has alleged it in his complaint, to the MEC. The MEC could reasonably believe that, in light of Straznicky's conduct as alleged by him, the summary suspension was warranted as the failure to summarily suspend him could result in an imminent harm to the health of any individual.

---

[6] During the hearing, Straznicky argued that he required the shield for his own protection, and thus to avoid harm. The necessary corollary is that, by removing this equipment from an operating room where it was needed for a procedure, Straznicky placed someone in that adjacent operating room at harm.

14

The remaining, third requirement addresses whether the action was taken after adequate notice and hearing procedures are afforded to the physician, or after such procedures as are fair to the physician under the circumstances. Section 11112(c) expressly recognizes that, when the circumstances warrant an immediate suspension, subsequent notice and hearing or other adequate procedure are to be afforded to the physician. As the court has found that the circumstances warranted a summary suspension, the issue would typically depend upon whether the procedure for subsequent notice and hearing was adequate. That process was initiated, but cut short, by Straznicky's decision to resolve this matter by signing the Privilege Retention Agreement rather than having a hearing.

The procedure that did occur was that Straznicky received a special Notice of Summary Suspension, delivered by hand with a signed receipt required. The Notice indicated the action being taken and the reasons for the action. The Notice informed Straznicky that he could request an interview with the MEC for purposes of determining whether the summary suspension should be terminated pending an evidentiary hearing, provided that he simultaneously requested an evidentiary hearing. Straznicky made this dual request on February 16, and was afforded the interview on February 18. On February 19, the MEC extended an offer to terminate the suspension, including a requirement that Straznicky sign the Privilege Retention Agreement. He did so on March 3. Straznicky was afforded and received an adequate post-suspension procedure.[7]

---

[7] The court's resolution addresses only that procedure actually provided and required under the circumstances. As alleged by Straznicky, from February 19 through March 3, he considered whether to sign the Privilege Retention Agreement. He was specifically notified to obtain advice of counsel prior to making a decision. He made that decision and signed the Privilege Retention Agreement on March 3. Thus, the adequacy of post-suspension procedures effectively waived by Straznicky's decisions and actions is not before the Court.

15

As Straznicky's complaint does not allege facts rebutting the presumption that his summary suspension was not taken pursuant to the requirements of §11112(a), and as the allegations of the complaint, as well as the documents relied upon by Straznicky in his complaint, establish that he could not allege facts rebutting the presumption that these standards were met, the court holds that the defendants are entitled to immunity from damages pursuant to §11111(a) (other than for damages in a civil rights claim). Accordingly, the court will grant the motion and dismiss Straznicky's complaint with prejudice to the extent it seeks monetary damages on non-civil rights claims arising from his summary suspension.

The defendants next argue that Straznicky's §1983 claim must be dismissed, with prejudice, as they are not state actors and did not engage in a state action. Straznicky counters that the defendants' summary suspension and other actions were state actions, subjecting the defendants to §1983 liability, because Desert Springs *may* have received Hill-Burton financial assistance, or other funds. To maintain his §1983 claim, Straznicky must demonstrate both that he was deprived of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law. *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003), *citing West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Although a §1983 action cannot generally be brought against a private party, "a § 1983 action can lie against a private party when 'he is a willful participant in joint action with the State or its agents.'" *Id.*, *quoting Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

Straznicky fails to cite to any decision of the Ninth Circuit suggesting that a private hospital's receipt of Hill-Burton funds renders the hospital a state actor (or causes its actions to be state actions) for purposes of §1983. Straznicky's citation to *Duffield v. Charleston Area Medical Ctr., Inc.*, 503 F.2d 512 (4th Cir.1974), for this proposition is not well-taken by the court. The Fourth Circuit expressly overruled *Duffield* on this issue in

16

*Modaber v. Culpeper Memorial Hosp., Inc.*, 674 F.2d 1023, 1025 (4th Cir.1982) (overruling the holding that mere receipt of federal assistance under the Hill-Burton Act makes recipient's acts state actions).[8]  Rather, in 2002, the Fourth Circuit stated the following concerning a §1983 action brought against private hosptials:

> The Maryland credentialing statute and regulation both require hospitals to establish a formal reappointment process.  But the State plays no role whatsoever in the actual decision as to whether or not to terminate or reappoint any particular physician.  Because the private hospital defendants cannot properly be considered state actors, [the plaintiff's] section 1983 claim is dismissed.

*Freilich v. Upper Chesapeake Health, Inc.* 313 F.3d 205, 214 n.3 (4th Cir. 2002).

Straznicky also relies upon *Klinge v. Lutheran Charities Ass'n of St. Louis,* 523 F.2d 56 (8th Cir. 1975) for the same proposition: that a private hospital that receives Hill-Burton funds engages in state action when it removes a physician from staff.  The issue, however, was never decided in *Klinge*.  Rather, throughout the case, the court reiterated that no claim was made that the hospital's action was not state action. *Id.*, at 60-61. Consequently, the uncontested assumption of jurisdiction is entitled to little weight as a precedent that a private hospital's receipt of Hill-Burton funds renders its actions to be state actions.

As Straznicky has not alleged any facts, or cited to any decision, suggesting that the actions of a private hospital become state actions upon receipt of Hill-Burton financial assistance, the court will dismiss his §1983 claim with prejudice.

Therefore, for good cause shown,

THE COURT **ORDERS** that Dr. Hugh Bassewitz' Motion to Dismiss (#27) and the remaining Defendants' Motion to Dismiss (#18), joined by Dr. Bassewitz are GRANTED as follows:

---

[8] In light of *Modaber*, Straznicky's additional citation to *Harron v. United Hosp. Center, Inc.*, 384 F.Supp. 194 (D. W.Va 1974), *rev'd Harron v. United Hospital Center, Inc.,* 522 F.2d 1133 (4th Cir. 1975) (holding that the plaintiff-physician's underlying anti-trust and civil rights claims were frivolous), in support of this same proposition is equally misplaced.

1  Dr. Martin Straznicky's claims (other than his claim for Declaratory and Injunctive
2 Relief, and his 42 U.S.C. §1983 claim) are DISMISSED with prejudice as to each
3 defendant to the extent each claim seeks to hold defendants liable for monetary damages
4 arising from the professional review action taken against Dr. Martin Straznicky;
5  FURTHER, Dr. Martin Straznicky's 42 U.S.C. §1983 claim is DISMISSED with
6 prejudice as to each defendant;
7  FURTHER, to the extent that Dr. Martin Straznicky's claims arise from the filing of
8 the National Physician's Data Bank Report, and have not been dismissed with prejudice,
9 such claims are dismissed without prejudice as to each defendant as premature;
10  FURTHER, to the extent Dr. Martin Straznicky's federal claims have not been
11 dismissed with prejudice, or have not been dismissed without prejudice as premature,
12 those claims are dismissed without prejudice as to each defendant;
13  FURTHER, to the extent Dr. Martin Straznicky's state claims have not been
14 dismissed with prejudice, those claims are dismissed without prejudice as to each
15 defendant as the court declines to exercise supplemental jurisdiction over those claims.
16  THE COURT FURTHER **ORDERS** that, as to any claim dismissed without prejudice,
17 other than a claim dismissed as premature, the plaintiff shall have no more than thirty days
18 from the date this Order is Entered and Served to amend his complaint.

DATED this 30 day of June, 2009.

_____
Lloyd D. George
United States District Judge